Filed 4/16/13  In re A.C. CA6
Reposted to provide correct filing date; no change to text
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | H038929 (Santa Clara County Super. Ct. No. JD21014) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>B.C.,<br><br>Defendant and Appellant. | |

Appellant B.C. appeals from an order adjudging his son A.C. a dependent child under Welfare and Institutions Code section 300, subdivisions (b) [failure to protect] and (j) [abuse of sibling].  He contends:  (1) there was insufficient evidence to support jurisdiction, and (2) the juvenile court erred in considering hearsay evidence.[1]  We affirm.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

## I.   Factual and Procedural Background

Appellant and S.C. (mother) are the parents of A.C., who was born in December 2011.[2]  In January 2012, the Department of Family and Children's Services (Department) filed a juvenile dependency petition alleging that A.C. came within the jurisdiction of the juvenile court under section 300, subdivisions (b) and (j).  The petition alleged that A.C. was at substantial risk of serious physical harm due to appellant's physical and sexual abuse of A.C.'s half siblings and the mother's inability to adequately protect him.  The petition included allegations that:  (1) there was domestic violence between the parents, (2) appellant had been arrested after A.C.'s half sisters, 16-year-old Deborah and 17-year-old Lydia, accused him of having sexual intercourse and oral sex with them on multiple occasions and threatening them with physical harm if they disclosed the abuse, (3) appellant's parental rights to A.C.'s half sibling, Stephen, were terminated based on physical abuse by appellant and domestic violence between appellant and Stephen's mother, (4) appellant physically abused A.C.'s half sibling, Gabriel, when he was an infant, (5) appellant had a criminal history, (6) the mother minimized the domestic violence between her and appellant and would allow appellant to return home after his release from custody, and (7) the mother did not believe that appellant sexually or physically abused any of A.C.'s half siblings.

The jurisdiction/disposition report, dated February 15, 2012, recommended that the court take jurisdiction of A.C., family maintenance services be provided for the mother, and no services be provided for appellant.  The report summarized the domestic violence perpetrated by appellant against his ex-wives and the mother, appellant's physical abuse of his other children, and appellant's sexual abuse of his daughters.

Vicky R. was appellant's first wife.  They were married in 1991 and they are the parents of Stephen, Lydia, and Deborah.  In 1993, Stephen became a dependent of the

---

[2]   The mother is not a party to the appeal.

court when he was 11 months old due to physical abuse and domestic violence. At that time, Stephen had multiple bruises on his head, face, and neck as well as a possible fractured femur. These injuries were found consistent with abuse. Though appellant and Vicky R. were provided with reunification services, they failed to reunify with Stephen and their parental rights were terminated. Vicky R. originally denied any abuse of Stephen and domestic violence between her and appellant. However, in 2011, she reported that appellant had physically abused Stephen. She explained that she was too terrified of appellant at the time to tell the truth because he was so abusive to her.

E. Z. was appellant's second wife. In 1998, it was reported that Deborah and Lydia were exposed to domestic violence by appellant against E. Z. Appellant was arrested for assaulting E. Z., and she obtained a restraining order against him. After E. Z. was granted temporary legal guardianship of Deborah and Lydia, the referral was closed.

Appellant married Vicky D. in 2003.[3] Vicky D. reported that appellant habitually psychologically and physically abused her. Appellant pushed her against walls, restrained her, hit her, choked her, threatened to kill her, bit her, locked her in the bedroom or bathroom, and never let her talk to anyone. He also called her names and forced her to have sex with him. After their son Gabriel was born in 2004, appellant began abusing him. He grabbed or yanked Gabriel from Vicky D.'s arms, threatened to give him away, shook him continuously, spun him in his jumper seat until his eyes crossed and then laughed, yelled at him, and slammed the wall loudly to scare him. He then prevented Vicky D. from comforting or caring for Gabriel.

The mother and appellant met at church in 2005. They were married in 2008. The mother has a bachelor's degree in human development and has worked as a preschool teacher for many years.

---

[3] There is no information regarding Amber C., who was appellant's third wife.

In 2009, Gabriel became a dependent of the court because Vicky D. was unable to care for him due to his severe mental health issues. Reunification services were offered to Vicky D., but they were not offered to appellant. Appellant's whereabouts were unknown at that time.

In December 2009, Lydia and Deborah were adjudged dependents of the court in Sacramento County due to physical and emotional abuse by E. Z. The girls were then placed with appellant over the social worker's objection, and the case was transferred to the juvenile court in Santa Clara County.

In May 2010, Lydia was placed into protective custody after appellant reported that he could no longer care for her. Lydia remained a dependent of the court, and she and appellant participated in family reunification services due to her emotional and behavioral problems. In June 2011, the juvenile court placed Lydia with appellant and ordered family maintenance services.

In December 2010, it was reported that Deborah told friends that she was being sexually abused by appellant. However, Deborah denied making this disclosure and the referral was closed. A few days later, appellant successfully completed family maintenance services and the juvenile court dismissed the case involving Deborah with full custody to appellant.

In October 2011, Lydia and Deborah were placed into protective custody after appellant was arrested for sexually abusing Deborah. Deborah reported to her basketball coach that appellant had been physically abusive in the past and that her life was a "living hell" at home. After the coach contacted the police, Deborah told the investigating officer that she had sexual intercourse with appellant 25 times and oral sex twice since she was 14 years old. She also stated that appellant had threatened to "hurt" her and "throw [her] into a mental institution" if she reported the abuse. When Deborah reported the abuse, Lydia denied being sexually abused by appellant and claimed that Deborah was lying. However, in December 2011, Lydia reported that she had been sexually

4

abused by appellant as well. She also stated that she had said that Deborah was lying because she was afraid of appellant due to his past threats. Lydia stated that she had sexual intercourse with appellant more than 20 times and oral sex approximately five times since she was 15 years old. Appellant had also threatened her if she reported the abuse. The report includes a detailed account of appellant's sexual abuse of Lydia and Deborah.

In addition, both Deborah and Lydia reported that appellant was verbally and physically abusive to the mother. Appellant called the mother names and fought a lot with her. Deborah described a fight between appellant and the mother after which the mother told her that appellant had choked her. The mother also told Deborah that appellant had "done it more than once." Deborah heard the mother threaten to leave on another occasion, and appellant said, "Do it, and I'll kill you."

The jurisdiction/disposition report summarized appellant's criminal history. In 1995, appellant was convicted of possession, manufacture, or sale of a dangerous weapon (Penal Code, former § 12020, subd. (a)), a felony, after the police responded to a domestic dispute and found appellant in his garage with nunchucks and a 12-inch hunting knife with Lydia, who was then four months old. A witness stated that appellant was "acting crazy and wasn't thinking straight" and threatened to kill Lydia if anyone tried to enter the garage to speak to him.

In 1999, appellant was convicted of infliction of corporal injury on a spouse (Penal Code, § 273.5, subd. (a)), a felony, after an incident in which appellant hit E. Z. several times in the stomach and kicked her as she tried to flee. At that time, E. Z. reported other incidents of abuse. She also stated that she was afraid that if she reported abuse, appellant would beat her more. According to E. Z., appellant had a bad temper and took his anger out on others. On one occasion, appellant threw their puppy and broke her leg.

In 2005, appellant was convicted of infliction of corporal injury on a spouse (Penal Code, § 273.5, subd. (a)), a misdemeanor, after Vicky D. reported that appellant had

5

grabbed her and squeezed her arm with such force that she had a large bruise. She described appellant as a "religious zealot," who had ordered her to "submit" to him because it was God's word.

The jurisdiction/disposition report also stated that the mother minimized the domestic violence between her and appellant, denied that appellant had abused her in the past, did not believe that appellant either sexually or physically abused any of his children, and did not believe that she needed services to protect A.C. The mother also "stated that she was aware of [appellant's] domestic violence convictions in the past and that he lost his parental rights to his first child, but she still [did] not believe that he was abusive toward any of his ex-wives or other children." The mother reported that she did not know what she would do regarding A.C.'s living arrangements and his care when appellant was released from custody. Based on the mother's denial, the social worker concluded that it was "very likely" that the mother would allow appellant to return to the home, thereby placing A.C. at risk.

An addendum report, dated March 22, 2012, stated that the mother and A.C. had recently moved to San Mateo County. The social worker also informed the court that the mother continued to deny any domestic violence between her and appellant and she did not believe that Lydia and Deborah had been sexually abused by appellant. The mother stated that she believed that appellant's ex-wives had lied about abuse and that appellant "has been nothing but wonderful to her and his children." Attached to the report was a copy of the second amended petition regarding Deborah, which the court had sustained earlier that month.

In June 2012, the Department filed a second amended petition. The second amended petition added allegations that the juvenile court had sustained second amended petitions and took jurisdiction of both Deborah and Lydia after finding that their reports of threats and sexual abuse were true.

6

A second addendum report, dated July 24, 2012, stated that appellant was in jail awaiting trial on charges that he sexually abused his daughters. The Department also recommended that jurisdiction be completed and the case be transferred to San Mateo County for disposition. Attached to the report was a copy of a minute order, dated June 22, 2012, which stated that the allegations in the first amended supplemental petition regarding Lydia were true.

On August 17, 2012, the jurisdiction hearing was held. The jurisdiction/disposition, addendum, and second addendum reports were admitted into evidence. The only witness was Edwin Patrick, the supervising social worker, who testified as an expert on risk assessment of dependent children. He testified that Susan Lee was the investigative social worker, but she went on leave in late June. According to Patrick, A.C. came to the attention of the Department because he had two half siblings who were dependents of the court. Patrick never spoke to either appellant or the mother. However, Lee consulted with him on a regular basis. Patrick also reviewed police reports involving appellant and the dependency reports from Sacramento County.

Patrick acknowledged that in cases where a father has sexually abused his daughter, it is not common that the father has also sexually abused the son. However, Patrick opined that A.C. was at risk of sexual abuse from appellant because "the motivation is not sex, the motivation is domination and control." He explained that appellant "has exhibited a pattern of behavior that shows that he dominates and controls his family." He noted that appellant physically abused his previous wives, physically abused the infant child Gabriel, sexually abused his two daughters, and physically abused the mother. According to Patrick, the mother could not protect A.C. because she "doesn't believe anyone -- that [appellant] has harmed anyone and that the previous wives of [appellant are] lying, the information about Gabriel is false, the testimony regarding Debra and Lydia [] is a lie as well. [¶] However, the mother did disclose to Debra that [appellant] physically abused her and threatened her, but the mother has since recanted."

7

Patrick concluded that the mother was "in severe denial" and was controlled by appellant, which placed A.C. at risk if he was returned to the home. Patrick was not concerned that the mother would abuse A.C. However, the mother had indicated that if appellant was released from jail, she would allow him to return home. Patrick was also concerned that if the petition was dismissed, the mother would leave with A.C. and reconnect with appellant in the event that he was released from jail.

Following argument, the juvenile court sustained the petition and stated: "What is remarkable to me is, when I look at . . . the cases regarding sexual abuse, [appellant] falls squarely in the aberrant behavior category. He has for over a 10-year period either done physical or sexual harm to some member of his family. And I think the expert's testimony regarding risk assessment is quite on point when it talks about the dominion and control exhibited by [appellant] toward his family members regardless of their age. It doesn't matter if they're as young as Gabriel was or as old as his daughters were, his behavior toward them has been violent." The juvenile court also noted that it was "absolutely uncontroverted" that the mother did not believe that appellant sexually abused his daughters, physically abused two of his sons, and was violent towards his ex-wives. The juvenile court concluded that the mother's refusal to acknowledge appellant's behavior put A.C. at risk.

On September 18, 2012, the juvenile court conducted the disposition hearing. The juvenile court adjudged A.C. a dependent of the court and ordered that he be removed from appellant's custody. Family maintenance services were ordered for A.C. and the mother, and the case was transferred to San Mateo County.

## II. Discussion

### A. Sufficiency of Evidence

8

Appellant contends that there was insufficient evidence to support jurisdiction under section 300, subdivisions (b) and (j).

"Section 300 jurisdiction hearings require a preponderance of the evidence as the standard of proof. (§ 355, subd. (a).) In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388 (*A.M.*).)

In order to sustain a petition under section 300, subdivision (b), the juvenile court must find that "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (§ 300, subd. (b).) The juvenile court must determine "whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm. [Citations.] Thus, the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; '[t]here must be some reason to believe the acts may continue in the future.' [Citations.]" (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, fn. omitted.)

Relying on *In re Rubisela E.* (2000) 85 Cal.App.4th 177, *In re Maria R.* (2010) 185 Cal.App.4th 48, and *In re Alexis S.* (2012) 205 Cal.App.4th 48, appellant argues that there was insufficient evidence that A.C. was currently at substantial risk of harm since his gender was different from that of his sexually abused siblings.

We first note that other courts have held that male siblings of sexually abused females are at risk of sexual abuse, because "aberrant sexual behavior by a parent places

9

the victim's siblings who remain in the home at risk of aberrant sexual behavior." (*In re P.A.* (2006) 144 Cal.App.4th 1339, 1347; accord *In re Andy G.* (2010) 183 Cal.App.4th 1405, 1414; *In re Karen R.* (2001) 95 Cal.App.4th 84, 90-91.)[4] However, we need not resolve which line of authority to follow, since the present case includes appellant's extensive history of violence against family members regardless of their age or gender.

Here, the juvenile court had sustained petitions which included allegations that appellant had engaged in more than 20 incidents of sexual intercourse with each of his daughters during the past year and a half. That A.C. differed in age and gender from Deborah and Lydia was not particularly relevant, because, as Patrick opined, appellant's "motivation [was] not sex, the motivation [was] domination and control." He explained that appellant had "exhibited a pattern of behavior that shows that he dominates and controls his family." The record fully supports Patrick's opinion.

Appellant had a significant history of violence against his children when they were infants. In 1993, Stephen, who was 11 months old, became a dependent of the court due to physical abuse perpetrated by appellant. Appellant's parental rights to Stephen were eventually terminated. In 1995, police officers responded to a domestic dispute in which appellant, while armed, was threatening to kill Lydia, who was then four months old. In 2004, appellant was also physically and psychologically abusive to Gabriel, who was then an infant. Despite this history of abuse and having been previously offered family reunification and family maintenance services, there was no evidence that appellant had attempted to ameliorate his violent tendencies towards children.

In addition to physical abuse, appellant also exposed his children to domestic violence. As *In re Heather A.* (1996) 52 Cal.App.4th 183 explained: "It is clear to this court that domestic violence in the same household where children are living *is* neglect; it is a failure to protect [the minors] from the substantial risk of encountering the violence

---

[4] This issue is currently under review by the California Supreme Court in *In re I.J.*, review granted Sept. 19, 2012, S204622.

and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*Id.* at p. 194.) Moreover, " '[p]ast violent behavior in a relationship is "the best predictor of future violence." Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of those relationships. . . . Even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner.' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 576.) Here, appellant was convicted of infliction of corporal injury on a spouse in 1999 and 2005. In addition to physically abusing E. Z. and Vicky D., appellant was physically abusive to Vicky R. and the mother.[5] Both Deborah and Lydia observed violence between appellant and the mother. Given appellant's history of abusing women, there was a substantial risk that A.C. would be exposed to domestic violence.

In sum, the record establishes that appellant physically abused his two infant sons, threatened to kill his infant daughter, exposed his children to domestic violence by physically abusing three ex-wives and the mother, and sexually abused his two daughters. Despite overwhelming evidence, the mother refused to acknowledge that appellant had engaged in any of this behavior. Thus, there was substantial evidence to support the juvenile court's finding that there was a substantial risk that A.C. would suffer serious physical harm as a result of his parent's inability to protect him.

Appellant also argues that A.C. was not at substantial risk of harm because he was incarcerated. This same argument was rejected in *In re Carlos T.* (2009) 174 Cal.App.4th 795. In that case, the Court of Appeal stated: "It certainly is true that at that time father had no immediate access to [the minors] due to his incarceration. But father had not yet

_____

[5]     Appellant contends that there was no risk to A.C., because the mother reported that there was no domestic violence between her and appellant. There is no merit to this contention. Though the mother claimed that there was no domestic violence between her and appellant, both Deborah and Lydia reported incidents of domestic violence involving appellant and the mother. Since this court must "view the record in the light most favorable to the juvenile court's order," we disregard the mother's claim. (*A.M.*, *supra*, 187 Cal.App.4th at p. 1388.)

11

been sentenced on his sexual molestation convictions, and he still had the right to appeal those convictions. [¶] If father's convictions were reversed, there is a possibility that father would be released from custody, and there is every reason to believe that father would resume his sexual abuse of [the minors] without the state intervening to prevent him from obtaining access to them." (*Id.* at p. 806.) Similarly, here, appellant has denied the charges and there remains the possibility that he would be released from custody.

Since we have found that there was substantial evidence to support the juvenile court's finding of jurisdiction under section 300, subdivision (b), we need not consider the sufficiency of the evidence to support its finding under section 300, subdivision (j). (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.)


### B. Admissibility of Evidence

Appellant next contends that the juvenile court erred in admitting hearsay evidence.

On cross-examination, Patrick was asked if he could identify any statements in the reports in which the mother had indicated that she would let appellant back into the home if he were released from custody. He was unable to do so. He then testified, "But I distinctly remember having a conversation with Susan Lee regarding the mother -- the conversation with her where she's indicated that she will allow the father back into the home." Appellant objected to the testimony as hearsay, noting that "[i]f that was something that was found by the social worker to come under the hearsay exception, it should have been in the social study." The juvenile court noted that the jurisdiction/disposition report stated Lee's opinion that it was "very likely" the mother would allow appellant to return to the home and have unsupervised contact with A.C. The juvenile court overruled the objection.

Evidence Code section 1200 states in relevant part that " '[h]earsay evidence' is evidence of a statement that was made other than by a witness while testifying at the

12

hearing and that is offered to prove the truth of the matter stated." Hearsay is inadmissible, unless it falls within an exception to the general rule. (Evid. Code, § 1200, subd. (b).) Evidence Code section 1201 authorizes the admission of multiple hearsay evidence under certain circumstances. This statute provides that "[a] statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201.) Exceptions to the hearsay rule include any admissions by a party. (Evid. Code, § 1220.) Thus, the mother's statements to Lee were admissible if Lee had been testifying or if they had been included in the reports. (See § 355, subd. (b).) Since Lee did not testify and the mother's statements to Lee were not included in the reports, the mother's statements to Lee were not admissible to prove that she would allow appellant to return to the home.

However, expert testimony in the form of an opinion can be based on information "made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) "Hearsay relied upon by experts in formulating their opinions is not testimonial because it is not offered for the truth of the facts stated but merely as the basis for the expert's opinion." (*People v. Cooper* (2007) 148 Cal.App.4th 731, 747.) Here, the parties stipulated that Patrick would testify as an expert on risk assessment of dependent children. In forming his opinion as to the risk to A.C., he relied on the social worker's statement to him that the mother had told her that she would allow appellant to return home if he was released from custody. Patrick reasonably relied on this statement in forming his opinion that A.C. was at risk of serious harm.

Even assuming that the juvenile court erred in admitting this evidence, it was not prejudicial. Where an alleged error violates state evidentiary law, this court examines

whether "' " " 'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.' " ' [Citations.]" (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 134.) Here, the jurisdiction/disposition report stated that the mother minimized the domestic violence between her and appellant, did not believe that appellant sexually or physically abused any of A.C.'s half siblings, and did not believe that she needed to engage in services to protect A.C. The mother also "stated that she was aware of [appellant's] domestic violence convictions in the past and that he lost his parental rights to his first child, but she still [did] not believe that he was abusive toward any of his ex-wives or other children." Thus, the mother had no reason not to reunite with appellant if he were released from custody. Accordingly, it is not reasonably probable that the result would have been more favorable to appellant if her statement had not been admitted.

## III.  Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.